UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>OSCAR PALMER,<br><br>                    Defendant. | **MEMORANDUM<br>OPINION & ORDER**<br><br>(S1) 14 Cr. 652 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

        The (S1) Indictment charges that on August 11, 2002, Defendant Oscar Palmer used, carried, and possessed a firearm during and in relation to, and in furtherance of, a conspiracy to distribute cocaine, and that in the course of committing that crime, he used the firearm to cause the death of Andrew Balcarran, in violation of 18 U.S.C. § 924(j).  ((S1) Indictment (Dkt. No. 35))  Palmer has moved to dismiss, arguing that the Government did not pursue his extradition from the Dominican Republic in a timely fashion, and thus violated Palmer's Sixth Amendment right to a speedy trial.  (Def. Br. (Dkt. No. 229) at 3)[1]  For the reasons stated below, Defendant's motion to dismiss will be denied.

## BACKGROUND

**I.**      **FACTUAL ALLEGATIONS**[2]

        In 2002, Oscar Palmer, a/k/a "Tito," was the chief lieutenant of a drug trafficking organization that sold cocaine and crack cocaine in the vicinity of 169th Street and Franklin Avenue in the Bronx.  Andrew Balcarran operated a competing drug operation a block away.

---

[1]  Citations to page numbers of docketed materials correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.

[2]  The Court's factual statement is drawn largely from evidence offered at the June 2016 trial of Palmer's co-defendant, Efrain Lora ("Trial Tr."), and at a December 16, 2016 Fatico hearing concerning co-defendant Luis Trujillo ("Trujillo Sent. Hrg. Tr." (Dkt. No. 152)).

Balcarran threatened to kill Palmer if he and Lora did not stop selling drugs at their location. (Trial Tr. at 250, 262-63, 278; Trujillo Sent. Hrg. Tr. (Dkt. No. 152) at 40; Braccini Decl. (Dkt. No. 237-1) at ¶ 4)

Lora and Palmer concluded that they would have to murder Balcarran, because if they did not, he would kill them.  Lora ordered Palmer and Luis Lopez – another member of the gang – to take care of the problem.  Lopez approached his cousin, Dery Caban, about committing the murder.  Caban agreed.  Palmer and gang member Luis Trujillo retrieved two firearms from Trujillo's apartment.  Trujillo gave a shotgun to Caban and a handgun to Palmer, and instructed Caban how to shoot the shotgun.  (Trial Tr. at 251-54; Trujillo Sent. Hrg. Tr. (Dkt. No. 152) at 35, 40-41, 48-50)

On the afternoon of August 11, 2002, Trujillo drove Palmer and Caban to the vicinity of Balcarran's residence on Franklin Avenue between 169th and 170th Streets.  (Trial Tr. at 45-48, 125-26, 254-56)  Balcarran walked towards the parked car in which the three men were seated.  As Balcarran approached, Palmer and Caban shot him to death.  (Id. at 111, 116, 201-03, 249-56; Trujillo Sent. Hrg. Tr. (Dkt. No. 152) at 55-56)

Immediately after the shooting, Trujillo, Palmer, and Caban drove to a nearby parking lot to hide the firearms and clean the outside of the car.  (Trial Tr. at 257-59)  Palmer removed the car's license plate and attached the plate to another vehicle.  (Id. at 259)  The three then left the parking lot in the second vehicle.  (Id. at 260)  They were soon stopped by police officers investigating the murder; they explained that the shooters were in a different car.  The officers allowed the three to drive away.  They drove to Manhattan.  (Id. at 260-61; Trujillo Sent. Hrg. Tr. (Dkt. No. 152) at 61-62)  After arriving in Manhattan, Palmer told Caban that he and Trujillo were fleeing to Santo Domingo, and he invited Caban to go with them.  Caban declined

the invitation and never saw Palmer again.  (Trial Tr. at 261, 275; Trujillo Sent. Hrg. Tr. (Dkt. No. 152) at 62-63)

Luis Lopez later told his cousin Caban that Balcarran had been killed because Lora and Palmer "wanted to take [Balcarran's drug-selling] spot [on] 170th."  (Trial Tr. at 263)

After Balcarran's murder, Palmer moved to the Dominican Republic.  (Palmer Decl. (Dkt. No. 229-1) ¶ 5)  Palmer's then girlfriend has told the Government that a "couple of days" after the Balcarran murder, Palmer told her that they had to "leave now."  Palmer, his girlfriend, Trujillo, and another woman then travelled to Pennsylvania.  Palmer told his girlfriend that "the NYPD was looking for him," and that the police knew of the Pennsylvania location where they were staying.  A short time later, Palmer, Trujillo, and the women travelled to Florida.  Once in Florida, Palmer and Trujillo told the women to return to New York, and Palmer and Trujillo left for the Dominican Republic.  Years later, Palmer told his girlfriend that he was getting married to another woman in the Dominican Republic.  (Braccini Decl. (Dkt. No. 237-1) ¶ 4)[3]

Palmer states that he lived openly in the Dominican Republic with his wife and children, and that he used his own name for social media accounts, state-issued identification – including a driver's license and passport – and debit and credit cards.  (Palmer Decl. (Dkt. No. 229-1) ¶¶ 7-8; Def. Br. (Dkt. No. 229) at 5 n.1 (citing social media account profiles))  He worked at call and customer service centers and served as a deacon at his church.  (Palmer Decl. (Dkt. No. 229-1) ¶ 6)

---

[3] On March 11, 2004, Trujillo told law enforcement officers that he and Palmer fled to Pennsylvania after Balcarran's murder, and then to Florida.  He said that they were accompanied by two women.  Trujillo later left for the Dominican Republic, where he remained for about a year before returning to the United States.  (Braccini Decl. (Dkt. No. 237-1) at ¶ 3)

II.   **POST-MURDER INVESTIGATION**

New York City Police Department ("NYPD") officers conducted a canvass in the immediate aftermath of the Balcarran murder, but no witnesses were willing to cooperate. NYPD Detective Marcano responded to the crime scene and "followed leads that we got from phone calls, spoke to the family members to find out if they heard anything else that was going on, . . . did more canvasses for witnesses," and "stayed in the neighborhood just kind of riding around, looking around to speak to people, see if anybody heard anything about what happened." (Trial Tr. at 62-63, 73-74)  At an apartment building located across the street from the murder scene, Detective Marcano "press[ed] every doorbell or knock[ed] on every door . . . [,] asking every resident whether they saw or heard anything that day."  (Id. at 99-100)  Despite this effort, "[i]n 2005 the case went cold," because the NYPD "didn't have any new leads," and "didn't get any new information."  (Id. at 75)

More than a decade after Balcarran was killed, NYPD detectives brought the case to the U.S. Attorney's Office ("USAO") for the Southern District of New York.  (Braccini Decl. (Dkt. No. 237-1) ¶ 1)  The USAO interviewed additional witnesses, one of whom identified Palmer as having been in the car when Balcarran was shot.  (Trial Tr. at 44-48; see also id. at 140-41, 152 (witness Shavon Simms testifying that she spoke to the police "shortly after" the shooting but did not "tell them at the time everything [she] saw happen," because her "mom told [her] not to"; she provided more details to the police approximately eleven years later when she "was old enough to give [her] own statement"))  On January 15, 2014, the U.S. Department of Homeland Security, Customs and Border Protection database was updated to reflect a request by

the NYPD for notification if Palmer entered the United States, because he "is wanted by [the] NYPD for homicide."  (Braccini Decl. (Dkt. No. 237-1) ¶ 7)

III.   **PROCEDURAL HISTORY**

On October 1, 2014, a grand jury sitting in the Southern District of New York returned an indictment charging Palmer, Caban, and Trujillo with violating 18 U.S.C. §§ 924(j) and 2.  The indictment charges that the Defendants "willfully and knowingly, during and in relation to a drug trafficking crime . . . namely, a conspiracy to distribute and possess with the intent to distribute mixtures and substances containing a detectable amount of cocaine, . . . did use and carry firearms, and, in furtherance of such crime, did possess firearms, and did aid and abet the use, carrying, and possession of firearms, and in the course of that crime did cause the death of [Andrew Balcarran] through the use of firearms . . . by discharging, and aiding and abetting the discharge of, firearms at Balcarran."  (Indictment (Dkt. No. 2))  Caban and Trujillo were arrested and arraigned later that month.  (October 7, 2014 and October 29, 2014 minute entries)

At about the time the indictment was returned, "the Government prepared a 'Notice of Extenuating Circumstances Precluding Submission' for the DOJ's Capital Case Section ('CCS'), pursuant to Section 9-10.060 of the DOJ Justice Manual, informing [the] CCS that, due to extenuating circumstances, the defendants were being charged by indictment prior to the Government submitting the[] case for capital review."  (Robles Decl. (Dkt. No. 237-2) ¶ 4) At an October 15, 2014 pretrial conference for Defendant Caban, the Government informed the Court that it was preparing a capital case submission for the CCS.  (Id. ¶ 5)

At the time that the Government was preparing the CCS submission, it was aware that Palmer was living in the Dominican Republic.  (See Def. Br., Ex. 2 (Dkt. No. 229-2); Govt.

Opp. (Dkt. No. 237) at 6)  Indeed, the Government understood that – before the Dominican Republic would extradite Palmer – the USAO would have to provide assurances to the authorities in the Dominican Republic that it would not seek the death penalty.  (Warner Decl. (Dkt. No. 237-3) ¶ 8)

In late 2014, Caban's counsel retained a death penalty mitigation specialist, and on January 8, 2015, Caban's counsel requested court authorization for his mitigation specialist and an investigator to travel to Puerto Rico – where Caban had lived for seven years – to obtain documentary support for his capital case mitigation submission.  (Robles Decl. (Dkt. No. 237-2) ¶ 6; Jan. 16, 2015 Order (Dkt. No. 15); Trial Tr. at 199-200)  This Court approved that application on January 16, 2015.  (Robles Decl. (Dkt. No. 237-2) ¶ 6; Jan. 16, 2015 Order (Dkt. No. 15))  On April 3, 2015, Caban transmitted his capital case mitigation submission to the Government.  (Robles Decl. (Dkt. No. 237-2) ¶ 7)

On June 25, 2015, the USAO made its recommendation to the CCS as to whether the death penalty should be sought as to one or more of the Defendants.  The USAO's discussions with the CCS concerning this issue continued for the next several weeks.  (Id. ¶¶ 8-9)  During this period, the USAO informed the CCS that it had obtained Palmer's address in the Dominican Republic, along with his identification card and bank account information.  (Id. ¶ 9)  On August 4, 2015, the CCS sent the USAO a draft of its recommendation memorandum for the Capital Case Committee's review.  (Id.)  On September 2, 2015, the Attorney General directed the USAO not to seek the death penalty as to Palmer, Caban, and Trujillo.  (Id. ¶ 10)

On November 4, 2015, a grand jury in the Southern District of New York returned a superseding indictment that adds Efrain Lora and Luis Lopez as defendants.  (Dkt. No. 35)  On

February 18, 2016, Lopez pleaded guilty to aiding and abetting a violation of Section 924(j).[4]

(Lopez Plea Tr. (Dkt. No. 59))  During the period between December 10, 2015 and February 1,

2016, Lopez attended multiple proffer sessions with representatives of the USAO.  (Robles Decl.

(Dkt. No. 237-2) ¶12)

On March 24, 2016, Trujillo pleaded guilty to a superseding information that

charged him with conspiracy to distribute and possess with intent to distribute cocaine.[5]  (See

Dkt. Nos. 63-66, 67, 71)

On April 26, 2016, Caban pleaded guilty to the Section 924(j) charge, pursuant to

a cooperation agreement with the Government.[6]  (Robles Decl. (Dkt. No. 237-2) ¶ 15)  During

the period between August 18, 2015 and June 2, 2016, Caban attended multiple proffer sessions

with the USAO.  (Id. ¶ 11)

On May 11, 2016, the Government obtained a superseding indictment against

Lora, which added a drug trafficking conspiracy charge and a charge for causing the intentional

killing of Balcarran in furtherance of that conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A).

((S3) Indictment (Dkt. No. 74))  On June 20, 2016, Lora proceeded to trial.  On June 24, 2016,

the jury found Lora guilty of all three counts:  conspiracy to distribute or possess with intent to

distribute cocaine or cocaine base; use of a firearm in connection with the narcotics conspiracy,

causing the death of Andrew Balcarran; and causing the intentional killing of Andrew Balcarran

while engaged in the charged narcotics conspiracy.  (Verdict (Dkt. No. 110))[7]

---

[4]  The Court sentenced Lopez to ten years' imprisonment and five years' supervised release.
(Dkt. No. 137)
[5]  The Court sentenced Trujillo to five years' imprisonment and three years' supervised release.
(Dkt. No. 160)
[6]  Caban awaits sentencing.
[7]  The Court sentenced Lora to an aggregate sentence of thirty years' imprisonment and five
years' supervised release.  (Dkt. No. 207)

In or about June 2016, the USAO began preparing a draft of the AUSA affidavit in support of an application to extradite Palmer from the Dominican Republic.  (Robles Decl. (Dkt. No. 237-2) ¶ 16)  "Due to an internal miscommunication, [the USAO] did not submit Palmer's extradition application to [the Department of Justice's Office of International Affairs ('OIA')]" until "on or around November 8, 2018."  (Def. Br., Ex. 2 (Dkt. No. 229-2) at 3; Govt. Opp. (Dkt. No. 237) at 8-9)  OIA processed and reviewed the extradition package, and sent a certified and translated extradition package to the U.S. Department of State.  (Warner Decl. (Dkt. No. 237-3) ¶¶ 11, 21)  The State Department approved the extradition package on April 30, 2019, and transmitted a request to the U.S. Embassy in Santo Domingo to present the extradition package to Dominican Republic authorities.  (Id. ¶ 22)  The embassy formally presented the package to Dominican Republic authorities on May 2, 2019.  (Id.)

On July 23, 2020, Palmer was arrested at his home pursuant to a Dominican Republic extradition arrest warrant and was informed of the charge against him in the United States.  (Palmer Decl. (Dkt. No. 229-1) ¶ 9; Warner Decl. (Dkt. No. 237-3) ¶ 24)  On September 1, 2020, Palmer was extradited to the United States.  (Warner Decl. (Dkt. No. 237-3) ¶ 26)  He was arraigned on September 2, 2020.  (Dkt. No. 219)

On February 19, 2021, Palmer filed the instant motion to dismiss.  (Dkt. No. 229)  On May 12, 2021, the Court heard oral argument on the motion.  (Dkt. No. 249)  The parties then submitted supplemental briefing.  (Dkt. Nos. 251, 252)

## DISCUSSION

Palmer contends that the Section 924(j) charge against him must be dismissed, because the Government violated his Sixth Amendment right to a speedy trial.  According to

Palmer, the Government "negligently failed to pursue [his] extradition for over three years."

(Def. Br. (Dkt. No. 229) at 3 (emphasis omitted))

## I.      **APPLICABLE LAW**

The Sixth Amendment guarantees that "the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  "The right to a speedy trial has been deemed 'fundamental' to our system of justice since its inception."  United States v. Black, 918 F.3d 243, 253 (2d Cir. 2019) (citing Klopfer v. North Carolina, 386 U.S. 213, 226 (1967) ("The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution.")).  "The right to a speedy trial primarily protects three interests of criminal defendants:  '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'"  Id. at 254 (quoting Barker v. Wingo, 407 U.S. 514, 532 (1972)).  "Pursuant to the Sixth Amendment, the court and the government owe an 'affirmative obligation' to criminal defendants and to the public to bring matters to trial promptly.  This burden weighs particularly heavily on the government, which 'owe[s] the additional duty of monitoring the case and pressing the court for a reasonably prompt trial.'"  Id. at 253-54 (internal citations omitted).

"[T]he right to [a] speedy trial is a more vague concept than other procedural rights."  Barker, 407 U.S. at 521.  "The Supreme Court has identified four factors that must be balanced when considering whether the right has been violated:  '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'"  United States v. Moreno, 789 F.3d 72, 78 (2d Cir. 2015) (quoting Barker, 407 U.S. at 530).  "[N]one of the four factors [are] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  Barker, 407 U.S. at 533.

## II.   ANALYSIS

Approximately seventy months passed between the October 1, 2014 indictment and Palmer's arrest in the Dominican Republic on July 23, 2020.

### A.   Length of Delay

"The first factor, the length of delay, . . . operates as a threshold inquiry:  a Barker analysis is triggered only if a delay is so long as to be 'presumptively prejudicial.'"  Moreno, 789 F.3d at 78 (quoting Doggett v. United States, 505 U.S. 647, 652 (1992)).

Here, the Government concedes that the seventy-month delay between Palmer's indictment and his arrest in the Dominican Republic is sufficient to require a Barker analysis. (Govt. Opp. (Dkt. No. 237) at 12)  See United States v. Leaver, 358 F. Supp. 2d 255, 269 (S.D.N.Y. 2004) ("The post-indictment delay in this case is six years.  There can be no question that such a delay is presumptively prejudicial.").[8]

### B.   Reason for Delay

"The second factor – the reason for the delay – is often critical."  United States v. Cabral, 979 F.3d 150, 158 (2d Cir. 2020) (internal quotation marks and citation omitted).  This factor "asks [courts] to consider whether the delay was deliberate, neutral, or valid," Black, 918 F.3d at 260, and "to determine whether the Government is more to blame for the delay than the defendant."  Leaver, 358 F. Supp. 2d at 265.  "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side

---

[8]  The Second Circuit "ha[s] emphasized that 'the notion of a delay that is "presumptively prejudicial" (i.e. long enough to trigger a Sixth Amendment inquiry) should not be confused with a delay that is so long as to cause "presumptive prejudice" (i.e. prejudice that need not be specifically shown)' under the fourth Barker factor.  'The former bears upon the need for a Barker analysis, whereas the latter bears upon the merits of that analysis.'"  United States v. Cabral, 979 F.3d 150, 157 (2d Cir. 2020) (quoting Moreno, 789 F.3d at 78 n.3).

of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun."  Doggett, 505 U.S. at 657.

"The Government has a constitutional duty to make a diligent good faith effort to bring an accused to trial without unnecessary delay.  This duty does not end because an accused is outside the United States; in such a case, the Government has a duty to seek extradition, unless such an effort would be futile."  Leaver, 358 F. Supp. 2d at 265 (internal quotation marks and citations omitted).  "Where the Government asserts that the defendant was a fugitive avoiding prosecution, it must establish that it has fulfilled its 'obligation to exercise due diligence in attempting to locate and apprehend the accused.'"  United States v. Ramos, 420 F. Supp. 2d 241, 246 (S.D.N.Y. 2006) (quoting Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir.1988)).

The assessment of the Government's due diligence is "fact-specific."  Id. (citation omitted).  "In this context, the Sixth Amendment is 'rarely violated' if the delay is 'attributable entirely to the defendant,' or if the delay 'serves some legitimate government purpose' such as time to collect witnesses, oppose pretrial motions, or to track down a defendant if he goes into hiding."  Cabral, 979 F.3d at 158 (internal citations omitted).

As to Palmer's role in causing delay, "[t]he critical fact for purposes of assessing fault to a defendant" whom the Government accuses of "intentionally leaving the United States because he knew that he had no defense to his inevitable prosecution" is "his evasive actions to avoid ever facing such charges – whether formally filed or impending."  Id. at 159.

According to Palmer, he was "living, working, leading [his church], spending, and posting openly and under his own name for over a decade in the Dominican Republic." Therefore, "none of the post-indictment delay" is attributable to him.  (Def. Br. (Dkt. No. 229) at 14 (emphasis omitted); see also id. at 12-13; Def. Reply Br. (Dkt. No. 238) at 8 (contending that

Palmer is not responsible for any part of the delay because he did not take "any evasive or deliberate actions to cause delay")) "[A]t a minimum, over three of the six-year post-indictment delay" – from September 2015, when Palmer states that the Government could have completed its extradition request, to November 2018, when the Government submitted its extradition application to OIA – "is exclusively . . . the [G]overnment's fault." (Def. Br. (Dkt. No. 229) at 13)

The Government admits that "it knew [Palmer] was in the Dominican Republic at the time he was indicted" (Govt. Opp. (Dkt. No. 237) at 16 n.7), but the Government contends that Palmer's flight to the Dominican Republic is the primary cause of the entire seventy-month delay, because he fled to the Dominican Republic with the express purpose of "evad[ing] prosecution for Balcarran's murder." (Id. at 14-15) Even assuming arguendo that Palmer fled to the Dominican Republic for the specific purpose of evading prosecution, however, it does not necessarily follow that he is responsible for the entire period of delay. "[E]ven if a defendant flees to avoid capture or prosecution, the government can be at fault for the delay if it failed to use reasonable diligence to locate him and thereby lengthened the delay." Cabral, 979 F.3d at 158 (internal quotation marks and citations omitted).

This Court finds the Second Circuit's analysis in Cabral instructive here. In Cabral, postal inspectors had interviewed the defendant on September 29, 2006, about stolen checks that had been deposited in his bank account. He fled to Brazil several days later. In April 2007, postal inspectors confirmed that Cabral was in Brazil, and in November 2007, he was indicted for bank fraud. Id. at 153-54. Between October 2006 and March 2014, postal inspectors repeatedly conducted database searches to determine whether Cabral had returned to the United States. They also entered the defendant's name in the National Crime Information

Center ("NCIC") wanted persons database.  Despite taking these steps, the postal inspectors did

not detect, and were not informed, that Cabral had returned to the United States – pursuant to a

valid visa – seven times between 2012 and 2018, with each trip to the United States lasting

between several weeks and several months.  Cabral was finally arrested in a Houston airport in

October 2018, as he was returning to Brazil.  Id. at 155.

Cabral moved to dismiss the indictment on speedy trial grounds.  The district

court denied the motion, Cabral entered a conditional guilty plea, and appealed, arguing that the

eleven-year delay between his indictment and arrest violated his Sixth Amendment right to a

speedy trial.  Id. at 155-57.

In rejecting Cabral's appeal, the Second Circuit separately considered several

components which made up the eleven-year period of delay.  The court found that Cabral was

responsible for the first five years of delay, because he had returned to Brazil, which forbids

extradition of its citizens.  Id. at 158-160.  That finding did not the end of the inquiry, however.

The court noted that it must "separately assess whether the government was at fault for the delay

once Cabral returned to the United States under his real name in 2012, and then traveled back

and forth to the United States six additional times between September 2012 and his arrest in

October 2018."  Id. at 160.  The court went on to conclude that the postal inspectors' checks of

public databases and reliance on the NCIC wanted persons database, along with "additional

investigative steps taken when receiving information that Cabral may have returned to the United

States starting in 2012," constituted "serious investigative efforts to locate Cabral during the

entire period of delay, including the period from 2012 until his arrest in 2018 when he was

traveling back and forth to the United States without triggering NCIC notifications due to some

apparent malfunction in the system."  Id. at 162.

Consistent with Cabral, this Court will analyze each component period of delay in determining whether the Government exercised "reasonable diligence" in securing Palmer's extradition from the Dominican Republic.  Id. at 158.  The following time periods make up the seventy months of delay:

- an eleven-month period between October 2014 and September 2015 during which the Government considered whether it would seek the death penalty;

- a ten-month period between September 2015 and June 2016 during which the Government pursued plea negotiations and conducted proffer sessions with Palmer's co-defendants;

- a twenty-seven month period between July 2016 and September 2018 in which the USAO did not pursue an extradition application;

- an eight-month period between October 2018 and May 2019 during which the Government completed its extradition application and the application was delivered to Dominican Republic authorities; and

- a fourteen-month period between May 2019 and July 2020 during which Dominican Republic authorities were processing the extradition application – a period that ended with Palmer's arrest on July 23, 2020.

### 1.    Delay Resulting from Death Penalty Determination

As to the first eleven months of delay, Palmer concedes that "the period [during] which the government was seeking capital case review" was "a step that has to be taken, a[n]d the case law is clear that if the government is using reasonable diligence, then that period of time doesn't count against the government."  (May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 12; see also id. at 15)[9]  The Court concludes that the eleven months that passed between the October 1, 2014

---

[9]  Indeed, the "day-to-day tactical decisions of law enforcement" are afforded "a measure of deference."  Moreno, 789 F.3d at 79; see also Cabral, 979 F.3d at 161.  Here, with respect to the death penalty determination, the Government made "a consolidated submission to CCS as to all [three] defendants."  (Govt. Opp. (Dkt. No. 237) at 19)  In doing so, the Government permitted Caban to make a mitigation submission, which consumed approximately six months from the time Caban notified the Court that he was planning to make such a submission to the time that Caban transmitted his mitigation submission to the Government.  (Robles Decl. (Dkt. No. 237-2)

indictment and the Attorney General's September 2, 2015 decision not to seek the death penalty

is not attributable to unreasonable Government delay.

### 2.   Delay Caused by Dominican Republic Authorities

Palmer also concedes that – once the extradition application was delivered to

Dominican Republic authorities on May 2, 2019 – the period of delay continuing until Palmer's

arrest on July 23, 2020 is not an unreasonable delay, "because [the application was] . . . in the

Dominican Republic's hands."  (See May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 31)  Accordingly,

the fourteen-month period between the delivery of the extradition application to Dominican

Republic authorities and Palmer's arrest is not attributable to unreasonable Government delay.

See Garcia Montalvo v. United States, 862 F.2d 425, 426 (2d Cir. 1988) (holding that the "filing

of [an arrest] warrant [with Venezuelan authorities] satisfied the government's constitutional

duty to make a good-faith effort to return [defendant] from Venezuela").

### 3.   Delay Caused by Plea Negotiations and
### Proffer Sessions with Co-Defendants

Between September 2015 and June 2016, the Government was actively engaged

in proffer sessions and plea negotiations with Caban and Lopez.  The Government contends that,

given these circumstances, it was not required to take "immediate action to seek [Palmer's]

---

¶¶ 5-7)  The Court concludes that the Government's pursuit of the death penalty determination
was a necessary step in obtaining Palmer's extradition from the Dominican Republic, and that its
decision to do so simultaneously as to all three defendants was reasonable.  The Court further
concludes that the eleven-month delay associated with the death penalty determination was not
excessive.  See United States v. Abad, 514 F.3d 271, 274 (2d Cir. 2008) (finding a 31-month
delay "valid," given the "time needed for the Capital Case Unit to decide whether to seek the
death penalty . . . , including the time for the defendants to make mitigation submissions to the
[Justice Department]").

extradition" as soon as the Attorney General made the death penalty determination.[10]  (Govt.
Opp. (Dkt. No. 237) at 19)

       In arguing that the ten months spent conducting proffer sessions and plea
negotiations with Palmer's co-defendants does not constitute an unreasonable delay, the
Government notes that "the presence of a cooperating witness strengthened the Government's
extradition application."  (Govt. Opp. (Dkt. No. 237) at 20-21)  Courts have acknowledged that
time spent "negotiating plea deals [with] an accused's codefendants is part of the normal course
of prosecutions," and that where "the cooperation of . . . codefendants [would] buoy [the
Government's] case for . . . extradition," the delay associated with that process is not
unreasonable.  United States v. Cavan, No. 09-CR-1120 (PKC), 2016 WL 4098582, at *3
(S.D.N.Y. July 28, 2016) (ruling that an eight-month delay associated with negotiating
cooperation agreements with defendant's co-defendants was "justified").

       Having heard the evidence regarding Balcarran's murder at co-defendant Lora's
trial, it is obvious to this Court that Caban was the critical witness concerning this crime.  Indeed,
it is not clear that – absent Caban – the Government has proof beyond a reasonable doubt
regarding those who committed the murder.  No other witness at Lora's trial identified the
shooters.  Accordingly, Caban's decision to cooperate marked a signal change in this
prosecution, and his information very significantly increased the weight of the evidence against
Palmer and his co-defendants.

       At oral argument, the Court invited the parties to submit supplemental briefing
addressing whether "the Dominican Republic look[s] to the strength of the evidence against a

---

[10]  Palmer has not argued that the Government should have begun plea negotiations with his co-
defendants during the pendency of the death penalty review process.

person in deciding whether to extradite them," such that the information garnered from a

cooperating witness – here, Caban – would strengthen the Government's extradition application.

(May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 19-20)

In its supplemental submission, the Government provides a declaration from

David P. Warner, OIA's Associate Director.  Warner summarizes the requirements for an

extradition application as stated in the 2015 Extradition Treaty between the United States and the

Dominican Republic.[11]  Article 7 of the 2015 Extradition Treaty provides as follows:

> 2. All extradition requests shall be supported by:
>
> (a)  documents, statements, or other types of information that describe the identity, nationality, and probable location of the person sought;
>
> (b)  information describing the facts of the offense or offenses and the procedural history of the case;
>
> (c)  the text of the law or laws describing the offense or offenses for which extradition is requested and the applicable penalty or penalties;
>
> (d)  the statement required by Article 5, paragraph 3; and
>
> (e)  the documents, statements, or other types of information specified in . . . paragraph 3 . . . of this Article, as applicable.
>
> 3. In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall also be supported by:
>
> (a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority;
> (b) a copy of the document setting forth the charges against the person sought; and
>
> (c) such information as would provide a reasonable basis to believe the person sought committed the offense or offenses for which extradition is requested.

---

[11]  Palmer notes that the 2015 Treaty was not ratified until December 15, 2016, such that the Treaty of 1909 was the operative extradition treaty in September 2015, when the Attorney General made the death penalty determination and the extradition application could have been submitted to the Dominican Republic.  (Def. Supp. Br. (Dkt. No. 252) at 2-3)  Palmer concedes, however, that there is no difference between these two treaties as to the standard of evidence required for extradition.  (Id. at 3)  Accordingly, this Court refers to the 2015 Treaty.

(Govt. Supp. Br., Ex. 1 (Dkt. No. 251-1) at 12)  The Government argues that the ten months spent obtaining information from Palmer's co-defendants was necessary in order to submit "a description of the evidence" that establishes "'a reasonable basis to believe that the person sought committed the offense'" underlying the extradition request.  (Govt. Supp. Br. (Dkt. No. 251) at 1 (quoting Warner Decl. (Dkt. No. 251-1) ¶ 2))

The Government has also provided the affidavit that it submitted to the Dominican Republic authorities in support of its application to extradite Palmer.  The affidavit discloses that Caban is cooperating with the Government, and sets forth in detail the information that Caban provided in his proffer sessions, including that Palmer and Caban shot and killed Balcarran in connection with a dispute over drug territory.  (Nicholas Aff. (Dkt. No. 251-2) ¶¶ 17-28)  In sum, it is clear that the affidavit that the Government submitted in support of its extradition request relies to a great extent on information supplied by Caban.

Palmer argues that it was not necessary for the Government to obtain guilty pleas and cooperation from Palmer's co-defendants before submitting an extradition application for Palmer because "the evidentiary standard required for extradition [from the Dominican Republic] is no higher than what is required for an indictment."  Palmer further asserts that "[t]he [G]overnment has not pointed to a single example where the Dominican government denied extradition on the basis of insufficient evidence."  (Palmer Supp. Br. (Dkt. No. 252) at 3)  Palmer also points out that "[t]he [G]overnment never actually claims that it deliberately chose to delay Mr. Palmer's extradition for an extra year to shore up its extradition application or to advance some legitimate law-enforcement objective."  (Id. at 4 (emphasis in original))  According to Palmer, to the extent information obtained through Caban's cooperation bolstered the extradition application, such benefit was "purely incidental."  (Id.)

18

As discussed above, the information supplied by Caban was not "incidental" to the affidavit submitted in support of Palmer's extradition.  To the contrary, the affidavit's factual allegations rest, to a great extent, on information supplied to the Government by Caban.  (See Nicholas Aff. (Dkt. No. 251-2) ¶¶ 17-28)  And Palmer has cited no case suggesting that delay associated with obtaining such critical information can be found unreasonable in determining whether the Government acted with "due diligence."  Rayborn, 858 F.2d at 90.  Indeed, courts addressing delay associated with securing cooperation from a co-defendant consider whether the cooperation served "to buoy" or "to strengthen [the Government's] case for . . . extradition." Cavan, 2016 WL 4098582, at *3.  Here, Caban's information did not merely "buoy" or "strengthen" the Government's extradition application; to a great extent, the extradition application rests on Caban's factual account.

As discussed above, "courts must give the day-to-day tactical decisions of law enforcement a measure of deference."  Moreno, 789 F.3d at 79.  In Moreno, the Second Circuit noted that "[c]ases of government negligence have typically involved the failure to make any 'serious effort' at investigation," and that "[a]n investigation is not unreasonable simply because it misfires or fails of its purpose, or because other measures would have been more fruitful."  Id. (emphasis in original, citation omitted).

Here, the Government's decision to secure Caban's cooperation before pursuing Palmer's extradition was not unreasonable.  In the absence of Caban's cooperation, it is far from clear that the Government could obtain a conviction at trial.  And absent Caban's factual account, the Government's extradition application would have contained very little probative evidence against Palmer.  Moreover, as Palmer concedes, "[t]here isn't a case . . . which says . . . it's unreasonable [delay attributable to] the [G]overnment when it's obtaining pleas and

proffering witnesses."  (May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 22); <u>see also</u> <u>United States v.</u> <u>Vassell</u>, 970 F.2d 1162, 1165 (2d Cir. 1992) (ruling that "a seven-month delay . . . is not transformed into a Sixth Amendment violation just because the government sought the delay to encourage a co-defendant to testify against a remaining defendant at trial").

        The Court concludes that the ten months between September 2015 and June 2016 – during which the Government secured guilty pleas and obtained information from Palmer's co-defendants – do not constitute unreasonable delay.

### 4.    <u>Delay Associated with Preparation of Extradition Application</u>

        During the twenty-seven months between July 2016 and September 2018, the USAO made no efforts to prepare an extradition application for Palmer.  The Government attributes this delay to "an internal miscommunication."  It is undisputed that this twenty-seven month delay was the result of Government negligence.  (Govt. Opp. (Dkt. No. 237) at 8-9, 17, 21)

        The Government contends that "[o]nce [it] realized its oversight, it acted promptly to finalize and submit the defendant's extradition application," and that it acted diligently during the period between September 28, 2018 and May 2019, when the application was submitted to the Dominican Republic.  (<u>Id.</u> at 21-22)  The Warner Declaration submitted by the Government chronicles the extradition process with the Dominican Republic and the various entities that must review and approve the application before submission.  (Warner Decl. (Dkt. No. 237-3) ¶¶ 5-14) This declaration demonstrates that the USAO and OIA worked in tandem between September 28, 2018 and January 25, 2019 to finalize the extradition package before transmitting it to the State Department, which then independently reviewed and certified the package before delivering it to Dominican Republic authorities on May 2, 2019.  (<u>Id.</u> ¶¶ 16-22)

There is no evidence that the eight-month period between October 2018 and May 2019 constitutes an unreasonable delay.  Once the Government became aware of its lapse in October 2018, it acted diligently with OIA to process the extradition application for delivery to the State Department, and ultimately to Dominican Republic authorities.

*      *      *      *

The Court concludes that – of the seventy months of delay between Palmer's indictment and his arrest – the Government is chargeable with only the twenty-seven months between July 2016 and September 2018, when the Government negligently failed to prepare an extradition application for Palmer due to "an internal miscommunication."

### C.   Defendant's Assertion of Rights

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."  Barker, 407 U.S. at 531–32.  So long as Palmer was not aware of his indictment until his arrest, he "is not to be taxed for invoking his speedy trial right only after his arrest."  Doggett, 505 U.S. at 654.  However, if Palmer "knew of his indictment years before he was arrested" and failed to assert his speedy trial right, this factor "would be weighed heavily against him."  Id. at 653.

Palmer contends that he timely asserted his right to a speedy trial.  He states that, prior to his arrest, he "was not aware of the charge[] filed against [him] in the United States."  (Palmer Decl. (Dkt. No. 229-1) ¶ 9)  Moreover, he sought a briefing schedule for the instant motion within three days of the Government's disclosure of the circumstances of the delay between his indictment and arrest.  (Def. Br. (Dkt. No. 229) at 15; Def. Reply Br. (Dkt. No. 238) at 10)

The Government argues that Palmer fled the United States to avoid "imminent legal trouble in the United States," and that he acknowledged "that the NYPD was looking for

21

him." (Govt. Opp. (Dkt. No. 237) at 23)  Given that Palmer was "'aware of a government investigation and imminent charges,'" the Government contends that his knowledge of the formal charge – <u>i.e.</u>, the issuance of an indictment – is not dispositive.  (<u>Id.</u> at 23-24 (quoting <u>Cabral</u>, 979 F.3d at 159); <u>see also</u> May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 52 ("[I]t doesn't matter whether the defendant knew he had been indicted.  It was enough that he suspected that charges were coming."))

The case law does not support the Government's argument.  Where a defendant fled to avoid imminent prosecution, courts considering whether that defendant timely asserted his right to a speedy trial look to post-charge knowledge and conduct, rather than pre-indictment flight.  <u>See</u> <u>Cabral</u>, 979 F.3d at 157 ("[I]t is uncontroverted that Cabral asserted his right to a speedy trial in a timely fashion once he was arrested.")[12]; <u>see</u> <u>also</u> <u>Doggett</u>, 505 U.S. at 653 (stating that if defendant "knew of his <u>indictment</u> years before he was arrested," then "<u>Barker</u>'s third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against him." (emphasis added)); <u>Leaver</u>, 358 F. Supp. 2d at 265 ("[W]here the defendant is unaware of the indictment, he cannot 'be taxed for invoking his speedy trial right only after his

---

[12]  Citing <u>Cabral</u>, the Government argues that the Court may determine, based on a defendant's "evasive actions to avoid ever facing [formal] charges, whether formally filed or pending," that a defendant "didn't have an interest in a speedy trial" (May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 50)  As discussed above, however, <u>Cabral</u> makes clear that a defendant's fugitive status is not dispositive of whether he timely asserted his right to a speedy trial.  <u>See</u> <u>Cabral</u>, 979 F.3d at 157-58.

The Government also argues that in <u>Rayborn,</u> the Second Circuit found "that the defendant's status as a fugitive and an absconder weighs heavily against him for this third <u>Barker</u> factor." (May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 52)  But Rayborn did not assert his right to a speedy trial until "well over three years after he was informed of the subject charge."  Given these circumstances, the Second Circuit concluded that his assertion of a speedy trial right was "simply too belated."  <u>Rayborn</u>, 858 F.2d at 92-93.  The facts in <u>Rayborn</u> are thus not analogous to the circumstances here, in which Palmer asserted his speedy trial right soon after he became aware of the charge against him, as a result of his arrest.

arrest.'" (citation omitted)).  Accordingly, the timeliness of Palmer's assertion of his speedy trial

right is determined based on his knowledge and conduct after his indictment on October 1, 2014.

The Government does not dispute Palmer's assertion that "[b]efore [his] arrest,

[he] was not aware of the charge[] filed against [him]."  (Palmer Decl. (Dkt. No. 229-1) ¶ 9)[13]

Accordingly, this Court concludes that Palmer acted expeditiously to assert his speedy trial right

in the months after his arrest, and that this factor thus weighs in his favor.

### D.    Prejudice to Defendant

"Excessive pretrial delay can inflict three kinds of cognizable prejudice:

(i) 'oppressive pretrial incarceration,' (ii) 'anxiety and concern of the accused,' and (iii) 'the

possibility that the defense will be impaired.' . . . 'Of these, the most serious is the last, because

the inability of a defendant adequately to prepare his case skews the fairness of the entire

system.'"  Moreno, 789 F.3d at 81 (quoting Barker, 407 U.S. at 532); accord Leaver, 358 F.

Supp. 2d at 268 ("[T]he major purpose of the Sixth Amendment is to protect against the

impairment of the accused's defense.").

The first and second categories of possible prejudice are not relevant here:

Palmer was not incarcerated until his arrest in 2020, and by his own account he was not aware of

the indictment prior to his arrest.  Accordingly, this Court will now consider the third category of

possible prejudice – "the possibility that the defense will be impaired."  Moreno, 789 F.3d at 81.

### 1.    Actual Prejudice Showing

Palmer contends that – as a result of the Government's delay in seeking his

extradition – he was placed at a "distinct disadvantage."  During this period, the Government

---

[13]  In his declaration, Palmer states that, "[p]rior to [his] arrest on July 23, 2020, [he] was not
informed by the government of the United States or the government of the Dominican Republic
that [he] had been charged by the government of the United States in connection with the
circumstances resulting in Andrew Balcarran's death."  (Palmer Decl. (Dkt. No. 238-1) ¶ 4)

obtained information about Palmer from his co-defendants, who had "an incentive to pin events on Palmer," and who "gave proffers, negotiated pleas, and were sentenced" in Palmer's absence. (Def. Br. (Dkt. No. 229) at 17)

To the extent that Palmer contends that he suffered prejudice because he was "denied the opportunity to gain the benefit of a cooperation agreement," the Second Circuit has rejected that argument.   United States v. Ghailani, 733 F.3d 29, 51 (2d. Cir. 2013).  Moreover, Palmer's co-defendants would have had the same incentive to implicate him even if he had been extradited earlier.

Palmer's argument also ignores significant advantages that flow from his knowledge of the Government's case.  Given his access to the trial transcript of co-defendant Lora, Palmer has a roadmap of the Government's case, including the evidence that the Government will likely seek to introduce, and the testimony that the Government's witnesses will likely offer.  Palmer also has access to hundreds of pages of trial testimony that is available for use in cross-examination and impeachment.

Finally, Palmer has not identified any witness or other evidence that has been lost or that has become unavailable as a result of any period of delay attributable to the Government. He has thus not shown that his ability to present a defense has been impaired or prejudiced in any way by the Government's delay.[14]

---

[14]  Palmer also contends that he will suffer prejudice as a result of witnesses' likely memory loss. In attempting to explain how this alleged witness memory loss is attributable to the twenty-seven month period during which the Government was negligent – as opposed to the nineteen years that have passed since the 2002 murder of Balcarran – Palmer asserts that after memories are "brought back to you through witness preparation and working with the government, and you testify at a trial," it is "natural" to presume a witness would "let it all go and think [they] will never have to do this again."  (May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 41)  But this is mere speculation, and Caban's consistent testimony at the Fatico hearing for co-defendant Trujillo six months after the conclusion of co-defendant Lora's trial rebuts this speculation.

2.      **Presumptive Prejudice**

Courts "generally . . . recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." Black, 918 F.3d at 264 (internal quotation marks and citations omitted). Accordingly, "[p]rejudice is presumed where there is a 'prolonged and unjustifiable delay.'" Leaver, 358 F. Supp. 2d at 272 (quoting Doggett, 505 U.S. at 657). The longer the period of unjustifiable delay, the less necessary it is for a defendant to show actual prejudice. See Doggett, 505 U.S. at 657; Moreno, 789 F.3d at 82 . When assessing whether the delay is long enough to allow a defendant to rely solely on the presumption of prejudice, courts consider only the portion of the total delay attributable to the Government. See Doggett, 505 U.S. at 657-58 (where the total delay between indictment and arrest was eight-and-a-half years, only the six years of delay attributable to the Government was considered for purposes of determining presumed prejudice). Finally, the Second Circuit has noted that "absent 'some additional compelling circumstance, such as bad faith by the prosecution or actual prejudice,'" prejudice based on the length of delay is "exceedingly rare." Moreno, 789 F.3d at 82 (quoting United States v. Jones, 91 F.3d 5, 9 (2d Cir. 1996)); see also Rayborn, 858 F.2d at 94 ("[C]ourts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice.").

Here, as discussed above, the period of delay attributable to the Government is twenty-seven months. This period of delay is not sufficient to support a finding of presumed prejudice. See United States v. Williams, 372 F.3d 96, 112-13 (2d Cir. 2004) (delay of nearly three years not sufficient to support a finding of presumed prejudice; the "[m]ost important[]" factor "weigh[ing] against a finding of unconstitutional delay" is that defendant "failed to

articulate prejudice from the delay with any specificity"); <u>Cavan</u>, 2016 WL 4098582, at *6

(delay of thirty-four months insufficient to "support[] a presumption of prejudice").

    Palmer concedes that there is no case in the Second Circuit "standing for the

proposition that prejudice can be presumed where there is a three-year period or less of negligent

delay." (May 12, 2021 Hrg. Tr. (Dkt. No. 249) at 25) Citing <u>Black</u> and <u>Leaver</u>, however,

Palmer contends that he need not show actual prejudice. (Def. Br. (Dkt. No. 229) at 16)

Palmer's argument is not persuasive.

    <u>Black</u> involved defendants who were incarcerated for more than five years and

were aware of a looming death penalty determination for nearly three years. <u>Black</u>, 918 F.3d at

264-65. These circumstances are not present here. And in <u>Leaver</u>, "the Government chose to

cease all active efforts and wait passively for [six years for] chance to deliver [the defendant]

into its hands." <u>Leaver</u>, 358 F. Supp. 2d at 271.

    "Because this Court has found that the Government is only minimally to blame

for the delay, the presumption of prejudice is correspondingly weakened." <u>Ramos</u>, 420 F. Supp.

2d at 252.[15]

---

[15] Citing law from other circuits, Palmer argues that "numerous courts" have found that a three-year delay is "sufficient to presume prejudice under the fourth factor." (Def. Br. (Dkt. No 229) at 16; Def. Reply (Dkt. No. 238) at 13 (citing <u>United States v. Ferreira</u>, 665 F.3d 701, 707 (6th Cir. 2011); <u>United States v. Ingram</u>, 446 F. 3d 1332, 1338 (11th Cir. 2006); <u>United States v. Erenas-Luna</u>, 560 F.3d 772, 777 (8th Cir. 2009))) Setting aside the fact that the Government is responsible for only twenty-seven months of delay here, in two of the cases Palmer cites, the court explicitly refused to impose a "bright-line rule" for presumptive prejudice, instead focusing on a context-specific and "functional analysis." <u>Ferreira</u>, 665 F.3d at 709; <u>accord Erenas-Luna</u>, 560 F.3d at 779. And where out-of-circuit courts have imposed a bright line test, they have required a much longer period of delay than the twenty-seven months at issue here. <u>See, e.g.</u>, <u>U.S. v. Bishop</u>, 629 F.3d 462, 466 (5th Cir. 2010) ("[The Fifth Circuit] has generally held that delays of less than five years are insufficient, by duration alone, to give rise to a presumption of prejudice and relieve the defendant of satisfying <u>Barker</u>'s fourth prong."); <u>United States v. Hicks</u>, 779 F.3d 1163, 1168 (10th Cir. 2015) ("Generally, [the Tenth Circuit] require[s] a delay of at

The Court concludes that no presumption of prejudice is applicable here.

\*     \*     \*     \*

While the overall period of delay between indictment and arrest is seventy months, as discussed above, the amount of delay attributable to the Government is only twenty-seven months.  While Palmer timely asserted his right to a speedy trial, he has not shown actual prejudice flowing from the Government's delay nor has he shown that a presumption of prejudice is applicable.

Where, as here, a defendant has shown no actual prejudice and the presumption of prejudice does not apply, a lengthy period of Government negligence is required to warrant dismissal.  "[T]oleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial. . . . To be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice."  Doggett, 505 U.S. at 657 (internal citation omitted) (dismissing an indictment where six years of the eight-and-a-half years of delay was due to Government negligence).  The Court concludes that the twenty-seven months of delay attributable to the Government here does not warrant dismissal of the indictment.  See Ghailani, 733 F.3d at 48 ("[The Second Circuit has] previously found circumstances which permitted delays of five, six, and seven years."); see also Flowers v. Warden, Conn. Corr. Inst., 853 F.2d 131, 133 (2d Cir. 1988) (collecting cases in which no speedy trial violation was found where delays ranged from two years to six years).

---

least six years before the defendant is relieved of his burden to present specific evidence of prejudice.").

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion to dismiss the (S1) Indictment

is denied.

Dated: New York, New York
September 1, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge